We move to the second case this morning, Gerstner v. Berryhill. Mr. Schultz. May it please the Court, Your Honor. Barry Schultz on behalf of the plaintiff appellant, Ashley Gerstner. In this case, the administrative law judge reached several conclusions which are not supported by the underlying facts, such that the ALJ does not build a requisite logical bridge between the evidence and his conclusions, and the ALJ failed to properly evaluate the opinion of the treating psychiatrist, Dr. Callahan. In addressing the subjective complaint analysis first, on page 32 of the administrative record, the ALJ says that, quote, the fact that the claimant was looking for work suggests that she did indeed retain the ability to perform work-related activities. Well, this Court has held in the Hill v. Colvin and Gisele v. Colvin case that the mere fact that someone is looking for work or desires to work does not allow for an inference that the person retains the ability to work. And, in fact, in this case, in this three-year period of time during which we have the medical records for, the ALJ referenced one time when Ms. Gerstner told her psychologist that she was going to be looking for a factory job. We don't even know if she actually ended up looking for that job. The ALJ's inference is inappropriate. Similarly, on page 33 of the record, the ALJ says that her treating psychologist, Dr. Nichols' recommendation that the claimant increase her activity level suggests that she retains the ability to perform considerable tasks despite her impairment. But the psychologist was merely telling his very depressed, very obese, and anxious patient that she needed to try to engage in some activity. But, in fact, the ALJ addressed this at the hearing, and at page 65 of the record, Ms. Gerstner testified that, in fact, she never did increase her activity level despite the psychologist's recommendation. And that would be because this record shows that she barely could leave the house. She lacked motivation to do things because of her significant mental impairments and the pain from her fibromyalgia. Similarly, the ALJ relied on normal, objective testing to discredit Ms. Gerstner's complaints concerning her fibromyalgia pain. And yet, the fact that the neurologist on a neurological examination did not find significant neurological findings, but then diagnosed her with fibromyalgia, doesn't discredit Ms. Gerstner's complaints. In fact, it supports her, the diagnosis of fibromyalgia, because it is a diagnosis of exclusion. So Ms. Gerstner doesn't claim that she had a neurological disorder, so normal neurological findings don't undermine her testimony. Similarly, the ALJ relied on an MRI of the brain that had a slight abnormality that later didn't show up, and an MRI of the cervical spine that was normal. But again, you wouldn't expect to find abnormalities on those tests, given that the claimant's impairment is fibromyalgia. So the ALJ's inferences, really over and over again in this decision, lack that logical basis that is required to affirm the ALJ's decision. And when it comes to the opinion of the treating psychiatrist, Dr. Callahan, the ALJ at page 37 of the record only gave one reason for rejecting Dr. Callahan's opinion, and that was that, with a few exceptions, Dr. Callahan noted relatively normal mental status examinations. That's not true based on the record. As we pointed out, in seven of the 13 treatment evaluations that the claimant had with Dr. Callahan, after her alleged onset date, the doctor noted that she had a dysthymic mood. And he based that opinion on the claimant's complaints, which were ongoing, of severe anxiety, sometimes with chest pain, there were two periods of suicidal ideation, possibly one suicide attempt with an overdose, worsening memory, concentration problems, and on and on. The ALJ did not, so the ALJ erred in finding that there were mostly normal mental status examinations. That's not true. But in addition, the ALJ failed to follow the regulatory checklist of factors in 20 CFR 404.15.27 in evaluating Dr. Callahan's opinion. And at page 37 is where the ALJ specifically states why he's giving that doctor's opinion little weight. And yet, the ALJ doesn't mention that Dr. Callahan had treated Ms. Gerstner for six years, that he saw her 13 times during the relevant time period, that he prescribed multiple medications, often changing the medications because there were side effects, so the claimant had to stop some, adjusting the medications. The ALJ failed to state how he considered the fact that Dr. Callahan was a psychiatrist with a medical degree. He failed to talk about the consistency of Dr. Callahan's opinion with the opinions of the other mental health practitioners of record. Dr. Nichols, the treating psychologist, gave a global assessment of function scores 21 times in his treatment notes. Of those 21 times, three times they were in the moderate range. The other 18 times they were in the seriously impaired range, which includes the possibility of being unable to hold a job. But Dr. Nichols' opinions were consistent with Dr. Callahan's opinion. Then there's an opinion of the treating nurse practitioner, Ms. Mouska, and while she only saw Ms. Gerstner one time when she filled out her opinion, her opinion was completely consistent with Dr. Callahan's opinion. Similarly, the records from the social worker, Ms. Sisko, who Ms. Gerstner had to see when her insurance ran out, she could no longer see Dr. Callahan. Her records show the severity and ongoing nature of Ms. Gerstner's symptoms. And then in addition, finally, there's the consultative examiner, Dr. Pushkash, who also noted severe symptoms of the plaintiff's multiple mental impairments and gave an opinion that she might not be able to handle the stress of work and would have significant limitations dealing with supervisors and coworkers. And consistency is one of the important factors that the ALJ is supposed to consider in weighing a treating doctor's opinion. So for these reasons, the plaintiff requests that this court reverse and remand the ALJ's decision. Thank you, Your Honors. Thank you, Your Honor. Mr. Denke. May it please the Court, Joshua Denke for the Appellee Social Security Administration. Ms. Gerstner has failed to carry her burden in this case of showing reversible error. I want to highlight in general first a couple of themes that we've dealt with in the oral argument here in the briefing from the appellant. First is that the appellant asked this court to impose a standard of articulation that not only is not required by law but is highly impractical. In an 18-page, single-space-type decision, the ALJ detailed Ms. Gerstner's treatment history, subjective complaints, medical opinions, and other evidence. The ALJ did, in fact... Dr. Callahan, forgive me, Dr. Callahan was Ms. Gerstner's treating psychiatrist for a period of six years. It seemed to me that he was more familiar with her condition and limitations than any other medical professional who evaluated her. Even if this ALJ didn't think his opinions, Callahan's opinions, were entitled to controlling weight, he certainly should have given his findings more significant consideration than they were afforded here. Well, I agree that Dr. Callahan certainly treated the patient, the appellant, for a long time. But Dr. Callahan did not have the benefit of seeing the other record evidence that the ALJ had. And in this case, we do have a range of medical opinions kind of all over the map on the mental limitations. And the ALJ's... Well, that was a medical opinion by him, too. He's an M.D. Absolutely, absolutely. And the ALJ gave that due consideration. But when you look at... What the ALJ did here was fixate. He cherry-picked through Dr. Callahan's notes after August of 2012 and paid no attention to the portions of the notes that reflected that her mental condition remained the same or had actually worsened. Dr. Callahan noted that after that date, after August of 2012, she continued to have a dysmetic mood, experienced anxiety, depression, sleep disturbances, limitations in concentration. He reiterated all of his diagnoses of generalized anxiety, of panic, of agoraphobia, bipolar disorder, ADD. He continued to describe medications to treat these conditions. And he even changed her bipolar medication, increasing the dosage in January of 2013 and then again three months later. We have ALJ cherry-picking here. Well, Your Honor, I think the record reflects the opposite here, just in that, first of all, the ALJ did credit Dr. Callahan's diagnoses. The ALJ did find there were severe and limiting impairments, depression, anxiety, and included a lot of limitations in the residual functional capacity finding to account for... You and I have two different records. The ALJ ignored Dr. Callahan's repeated findings of depression and dysthemia. Dr. Callahan had stated on the assessment form that Ms. Gerstner was extremely limited with regard to things like emotional stability, reliability, predictability. And everything that he found were things that would interfere with anyone working. Well, Your Honor, I'm sorry, I didn't mean to cut you off. Oh, I've cut you off. Go ahead. Sorry about that. Well, Your Honor, I think one important point here to look at is really looking at Dr. Callahan's treatment notes, a lot of what appellant points to is what appellant told Dr. Callahan is in her treatment history or what she reported. Then Dr. Callahan had a section on what his actual findings were based on these subjective complaints. A lot of what appellant reported does not appear in those findings. And the findings that are there, including depression, the ALJ did acknowledge. And when the ALJ said that these were mostly normal findings, the ALJ did point out that Dr. Callahan did find depression. And so it's an important distinction between what the appellant said to Dr. Callahan and what Dr. Callahan wrote down as an actual finding. And that's what the ALJ found as inconsistent. The ALJ also overlooked the extent to which Dr. Callahan's opinion was consistent with the opinions of other medical sources who treated her. You know, the ALJs have to consider psychologists and nurse practitioners. And, you know, for one, let's look at Dr. Nichols. Dr. Nichols diagnosed her with the same disorders found by Dr. Callahan. That nurse practitioner, Magske, or Magsger, treated her and opined that her mental abilities were limited to the same extent or even more than that found by Dr. Nichols. Nurse Magske's opinion suffers the same problems as Dr. Callahan's. And Dr. Nichols, while Dr. Nichols did not put forth an actual opinion about the appellant's residual functional capacity or limitations, Dr. Nichols' notes, again, if you look at those notes, they do show almost always normal mood. They don't show a lot of, very many at all, abnormal findings. And, again, the appellant points to what she believes are abnormal findings, but, in fact, are once again a recording of appellant's treatment history or a recording of what appellant told Dr. Nichols, but not what Dr. Nichols wrote down as actual findings from his examination. Could we go on for a minute to the severity of her pain? Because the ALJ off base in saying that her six months without medication undermined her testimony as to the pain she felt when the reason she discontinued her medication was because she lost medical insurance? She couldn't afford to pay for it, though. Well, of note, the ALJ pointed out about the fibromyalgia medication in particular not being taken for six months, but there's no indication that the appellant was not taking her other medications during the same time period or going for her other treatment during that same time period. So the record simply does not bear out that the appellant could not afford the fibromyalgia pain medication in particular. And the ALJ used that example and then went on to describe how, despite that, not having taken her fibromyalgia pain medication for six months, that examination thereafter was mostly normal. There weren't as much reports. There was a report of improvement. And so that was really the thrust of what the ALJ was saying there. The ALJ was not, there wasn't an indication in the record that the appellant could not afford any treatment during this time period, and despite not taking that medication for whatever reason, Ms. Gerstner's condition improved. That was the point of the ALJ bringing that point up. The appellant also raised, with regard to Dr. Callahan's opinion, the appellant did note that there was just one reason given, and I do want to point out that, again, in these treatment notes, most of them actually really do reflect that there were not abnormal findings by Dr. Callahan. Of the 13 office visit notes that Ms. Gerstner cited in her opening brief, I believe about half of them showed no abnormal findings whatsoever, and almost all the rest except one showed just one abnormal finding, and it was depression. And, again, the ALJ did acknowledge that. Now, with respect to the subjective complaints and the ALJ's consideration of that. Counsel, your time has expired. I'll give you another minute. Thank you. I appreciate it, Your Honor. I'll wrap it up quickly. I just wanted to point out that the appellant talked about looking for work, the ALJ's comment on looking for work, and the ALJ's comment about doctors saying increase your activity. This Court has talked about those issues in the past. This Court has not said that they are completely irrelevant. The ALJ considered them here, did not put undue emphasis on them. The ALJ did not consider the fact that the ALJ rightfully considered the fact that, at one point, she was actively looking for work. The ALJ did not draw a conclusion that, therefore, she must be able to work. But it is something. It's a piece that undermines the credibility, the subjective complaints of Ms. Gerstner. Thank you, Counsel. Mr. Schultz? You have three minutes, Mr. Schultz. Thank you. The question that the ALJ had to decide was whether or not Ms. Gerstner could sustain work activity. So the fact that sometimes when she saw her psychologist or psychiatrist, maybe her mood was fine sitting in an office with a therapist that she'd been treating with for six years, doesn't undermine the treating psychiatrist's opinion that if she had to work, that she would not be able to relate predictably or act in a socially appropriate manner or that she would miss work. In fact, the evidence shows, as Ms. Gerstner testified, that she lost. She had to leave her job of five years at Blockbuster because she had a mental breakdown. She could not handle the stress. And she got another job that lasted six months at Sprint. She also had to leave that job because she could not handle the stress. So those are the kinds of things that Dr. Callahan was seeing, and it was really his opinion that was critical. I'd also like to point out that at page 561 of the record, one of the more recent treatment notes from Dr. Callahan, he noted that Ms. Gerstner's condition was very treatment-resistant, and that's an important factor. So while the commissioner is saying, well, really the doctor's records don't show significant problems, the treating psychiatrist is saying that despite all of this medication he's given her, despite the therapy she's getting, the medication changes, her condition was still treatment-resistant. Is there an explanation for that? He does not know. There's no explanation. But he tried multiple medications and adjusting the medications, and sometimes they worked.  But despite that, she was still complaining of the same difficulties, difficulty leaving her house and things like that. Thank you, Your Honor. Thank you. Thanks to both counsel. The case is taken under advisement.